**COURT OF CHANCERY**
**OF THE**
**STATE OF DELAWARE**

MORGAN T. ZURN
VICE CHANCELLOR

LEONARD L. WILLIAMS JUSTICE CENTER
500 N. KING STREET, SUITE 11400
WILMINGTON, DELAWARE 19801-3734

July 11, 2025

E. Chaney Hall, Esquire
Fox Rothschild LLP
1201 North Market Street, Suite 1200
Wilmington, DE 19801

Raymond J. DiCamillo, Esquire
Richards, Layton & Finger, P.A.
920 North King Street
Wilmington, DE 19801

RE: *Transdev North America, Inc. v. Recess Holdco LLC*,
Civil Action No. 2023-1063-MTZ

Dear Counsel:

A transit services company purchased another transit service company's subsidiary. The purchase agreement subjected the seller to restrictive covenants, fencing off part of the North American transportation services market for the buyer. After the agreement closed, the buyer and seller submitted competing bids for several transit services contracts, and the seller hired one of the buyer's former employees. The buyer sued the seller for breaching the restrictive covenants and the implied covenant of good faith and fair dealing, and sought a declaratory judgment. The seller moved to dismiss. This letter addresses the seller's motion.

## I. BACKGROUND

Plaintiff Transdev North America, Inc. ("Buyer") provides contract-based passenger transportation services to institutions seeking to outsource their

transportation needs.[1]  Defendant Recess Holdco LLC ("Seller") provides student and non-student transportation services through its controlled affiliates.[2]

On October 25, 2022, Buyer and Seller entered a stock purchase agreement (the "Agreement") to facilitate Buyer's acquisition of Seller's subsidiary First Transit Topco Inc. ("Target"), which provides "passenger motor carrier mobility services, including fixed route bus services, paratransit, and shuttle bus services."[3] The acquisition closed on March 6, 2023 (the "Closing" or "Closing Date").[4]  After Closing, Seller continues to provide student and non-student transportation services through controlled affiliates.[5]

The Agreement contains a nonsolicitation provision (the "Nonsolicit")[6] and a noncompetition provision (the "Noncompete").[7]  Both restrictive covenants apply "[f]rom the Closing until the third (3rd) anniversary of the Closing."[8]

---

[1] Docket Item ("D.I.") 28 ¶ 3 [hereinafter "Compl."].

[2] *See id.* ¶¶ 7, 8, 10 n.12, 17, 18, 23–24.

[3] *Id.* ¶¶ 8 n.1; Compl. Ex. 1 at 1 [hereinafter "Agr."].

[4] Compl. ¶ 9; Agr. § 1.1.

[5] *See* Compl. ¶¶ 10 n.12, 18, 23.

[6] Agr. § 6.23(a)(i).

[7] *Id.* § 6.23(a)(ii).

[8] *Id.* § 6.23(a).

The Nonsolicit provides that "Seller shall not, and shall cause the other members of the Seller Group not to . . . directly or indirectly, solicit or hire . . . any employee of the Company Group, in each case as of immediately prior to the Closing."[9]  The "Seller Group" means Seller and its affiliates.[10]  The "Company Group" means Buyer and its affiliate entities.[11]  The Nonsolicit carves out two exceptions:

> [T]he foregoing restriction shall not apply to (i) generalized searches by use of advertising or recruiting efforts (including the use of search firms) that are not specifically targeted at such employees and hiring any individual who responds to such search or (ii) soliciting or hiring any such employee of the Company Group or other employee of Purchaser and its Subsidiaries who is no longer employed by the Company Group or Purchaser or any of its Affiliates and has not been so employed for one hundred eighty (180) days[.][12]

The Noncompete provides:

> Seller shall not, and shall cause the other members of the Seller Group not to . . . engage, directly or indirectly . . . in a business or endeavor in the United States or Canada that is competitive with the business of the Company and its Subsidiaries, in each case as conducted immediately prior to the date hereof or the Closing, excluding the FS Business ("Competitive Business") . . . .[13]

---

[9] *Id.* § 6.23(a)(i).

[10] *Id.* § 6.13(a).

[11] *Id.* § 1.1.

[12] *Id.* § 6.23(a)(i).

[13] *Id.* § 6.23(a)(ii).  The Noncompete specifies that it "shall not apply to (A) ownership of ten percent (10)% or less of the outstanding equity securities of any Person or (B) any person or business acquired by Seller or its Affiliates following the date hereof if, on the date of the entry of a definitive agreement with respect to such acquisition, less than thirty

Thus, the Noncompete carves out "FS Business" from the Noncompete's restriction on Competitive Activity (the "FS Business Exception"). Put differently: the Noncompete fences off part of the North American transportation market for Buyer, but Seller can continue to perform FS Business even within that fenced-off space. The Agreement defines "FS Business" as

> the business of Seller, First Student Topco Inc. [("Seller Sub 1"),[14]] and/or their respective controlled Affiliates and parent entities (which includes, for the avoidance of doubt, Total Transportation Corp., Pride Transportation Services, Inc., Bella Bus Corp., GVC II Inc., MJT Bus Company Inc. and Atlantic Garden Holdings, Corp. and each of their respective Subsidiaries) and their respective successors and assigns (other than the Company and its Subsidiaries) as of the date of this Agreement and/or the Closing Date.[15]

---

percent (30%) of the revenues of such Person or business for the twelve (12) months prior to the date of such entry are generated from a Competitive Business, but only, in the case of this clause (B), to the extent the Seller Group does not expand the revenues of such acquired Person or business beyond growth with existing customers or clients." *Id.*

[14] Seller Sub 1 is a subsidiary of Seller and a leading school bus operator. Compl. ¶¶ 7, 10 n.12.

[15] Agr. § 1.1. "Affiliate" is defined to include entities that a company, "directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with." *Id.*

The Agreement defines "Subsidiary" as follows: "'Subsidiary' of any Person (such Person for purposes of this definition, the 'Controlling Company') means any other Person (i) of which a majority of the outstanding voting securities or other voting equity interests, or a majority of any other interests having the power to direct or cause the direction of the management and policies of such other Person, are owned, directly or indirectly, by the Controlling Company and/or (ii) with respect to which the Controlling Company or its Subsidiaries is a general partner or managing member." *Id.*

At issue are the activities of three entities not explicitly named in the FS Business definition: (i) MPC Bus Corporation ("Seller Sub 2"), (ii) Autobus Transco (1988) Inc. ("Seller Sub 3"), and (iii) Autobus Dufresne Inc. ("Seller Sub 4").

Seller Sub 2 is a wholly owned subsidiary of Seller's affiliate Total Transportation Corp., which is listed in the FS Business definition.[16]

Seller Sub 3 is Seller's indirect wholly owned subsidiary.[17] Between the Agreement's signing and Closing, Seller Sub 3 acquired Seller Sub 4.[18] Upon that acquisition, Seller Sub 4 became Seller's indirect wholly owned subsidiary.[19] Seller Sub 4 is "engaged in the business of providing both student and non-student transit services in Montréal, QC, Canada."[20] As of Closing, Seller Sub 4 operated two non-student transportation contracts for Montreal-based public transportation organization Réseau de Transport Métropolitain (referred to as "EXO").[21]

---

[16] Compl. ¶ 49; Agr. § 1.1.

[17] Compl. ¶ 17.

[18] *Id.* ¶ 20 (noting Seller Sub 3 acquired Seller Sub 4 "[o]n or about February 11, 2023").

[19] *Id.* ¶ 21.

[20] *Id.* ¶ 23.

[21] *Id.*

### A. Buyer And Seller Submit Competing Proposals For Multiple Transit Services Contracts.

Since Closing, Buyer's and Seller's respective affiliates have submitted competing bids in response to several requests for proposal ("RFPs") for transit services contracts.[22]  Three RFPs are relevant here.

First, on April 21, 2023, EXO "released a request for proposal for public transportation services by bus" for certain bus networks (the "2023 EXO RFP").[23] Seller Sub 4 and a Buyer affiliate submitted competing proposals; neither won the contract.[24]

Second, on February 19, 2024, EXO released an RFP "for public transportation services by bus in the L'Assomption" area (the "2024 EXO RFP").[25] Seller Sub 3 and a Buyer affiliate both submitted bids.[26]  The Buyer affiliate was awarded the contract.[27]

---

[22] *See id.* ¶¶ 28, 30–31, 34, 37, 40, 44–45, 48.

[23] *Id.* ¶ 28.

[24] *Id.* ¶¶ 30–31.

[25] *Id.* ¶ 34.

[26] *See id.* ¶¶ 37, 40.

[27] *Id.* ¶ 41.

Third, on May 1, 2024, the New Jersey Transit Corporation ("NJ Transit") issued an RFP for paratransit services in NJ Transit Region 6 (the "Region 6 RFP").[28] Before Closing, Seller Sub 2 had "vied for but w[as] denied the business of the at-issue NJ Transit Region 6 work."[29] Seller Sub 2 won the contract.[30]

### B.     Seller Hires A Former General Manager Of Target.

After Closing, Seller hired Luis Pacheco, a former employee of Target who had a relationship with NJ Transit.[31] Seller included Pacheco on the NJ Transit Region 6 bid.[32]

On August 14, 2024, Buyer sent Seller a letter (the "August 14 Letter") notifying Buyer that Pacheco's hiring was "violative of Section 6.23(a)(i)," i.e., the Nonsolicit.[33] The letter states,

> [Buyer] recently learned that Luis Pacheco, an employee of the Company Group as of immediately prior to the Closing, is now employed by at least one entity included in Seller and the Seller Group . . . . [Buyer] has learned that Mr. Pacheco was specifically included on the improper NJT Region 6 RFP bid and, since being included on

---

[28] *Id.* ¶ 44; *see also* Compl. Ex. 21 at 1 n.2 [hereinafter "Aug. 14 Letter"].

[29] Compl. ¶ 51.

[30] *See* D.I. 36 at 9 [hereinafter "DOB"]; D.I. 57 at 7–8.

[31] Compl. ¶ 52; Aug. 14 Letter at 2.

[32] Compl. ¶ 52.

[33] Aug. 14 Letter at 2; Compl. ¶ 53.

the bid submission, has openly boasted that his employer would be awarded the NJT Region 6 contract.[34]

The letter demands that Seller cease its breaching conduct.[35] It does not request information regarding the circumstances of Pacheco's hiring, such as the date he was hired.[36]

### C.    Procedural History

Buyer sued on October 20, 2023,[37] and filed its amended complaint on October 22, 2024. Count I alleges separate claims for breaches of the Nonsolicit and Noncompete.[38] Count II alleges Seller breached the implied covenant of good faith and fair dealing.[39] Count III seeks a declaratory judgment for the alleged breaches.[40]

---

[34] Aug. 14 Letter at 2.

[35] *Id.* at 1–2.

[36] *See generally id.*

[37] D.I. 1.

[38] Compl. ¶¶ 54–61 ("[Seller] breached the Agreement by, as generally alleged above, engaging in (or allowing another within the Seller Group to engage in) prohibited competition as defined by the Agreement and, *separately*, by improperly hiring and employing a former employee of the Company Group." (emphasis added)).

[39] *Id.* ¶¶ 62–70.

[40] *Id.* ¶¶ 71–75.

On November 6, 2024, Seller moved to dismiss all counts for failure to state a claim.[41] The parties briefed the motion,[42] and I heard oral argument on May 13, 2025.[43] At argument, I became concerned about whether Buyer had a good faith basis for pleading that Seller's hiring Pacheco breached the Nonsolicit.[44] Buyer's counsel was candid at argument that Buyer did not know whether Pacheco's hiring qualified for an exception to the Nonsolicit.[45] Buyer hoped to learn that information in discovery, asserting it would be difficult to learn any other way.[46]

I invited the parties to submit supplemental letter briefs addressing my concerns.[47] Buyer submitted its opening letter brief on June 2, then submitted a

---

[41] D.I. 33.

[42] DOB; D.I. 40 [hereinafter "PAB"]; D.I. 43 [hereinafter "DRB"].

[43] D.I. 51; D.I. 54 [hereinafter "Hearing Tr."].

[44] *See generally* D.I. 52 [hereinafter "May 16 Letter"].

[45] Hearing Tr. 27–31 ("[W]e know that this individual who was formerly employed by part of [Target] was in the community saying I was hired and I'm working on this bid. So under cloak of darkness, we believe that there is something here that is improper. We just don't know the circumstances of when, how. We took the extra step -- counsel pointed to it . . . the letter where we affirmatively put [Seller] on notice of we believe this is improper and a breach of the nonsolicit, here are the reasons why we believe that. It is attached and therefore embraced by the complaint. So for purposes of Delaware's pleadings rules and the reasonable conceivability standard, is there a set of facts and circumstances that lead to this being a viable claim? Yeah, definitely, if this individual was hired in an improper way and doesn't fall under one of the exceptions.").

[46] *Id.* at 29–30 ("I couldn't even say we don't think these [exceptions] apply. I don't know because I don't know these facts. That's something for discovery.").

[47] May 16 Letter at 4.

corrected version on June 4.[48]  Seller's answering letter and Buyer's reply

followed.[49]

## II.    ANALYSIS

The standard governing Seller's motion to dismiss is familiar:

> (i) [A]ll well-pleaded factual allegations are accepted as true; (ii) even vague allegations are "well-pleaded" if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and [(iv)] dismissal is inappropriate unless the "plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof."[50]

The touchstone "to survive a motion to dismiss is reasonable

'conceivability.'"[51]  This standard is "minimal"[52] and plaintiff-friendly.[53]  "Indeed,

it may, as a factual matter, ultimately prove impossible for the plaintiff to prove [its]

claims at a later stage of a proceeding, but that is not the test to survive a motion to

---

[48] D.I. 56; D.I. 57 ["Corrected Op. Letter Br."].

[49] D.I. 58 [hereinafter "Ans. Letter Br."]; D.I. 63 [hereinafter "Reply Letter Br."].

[50] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002) (citations omitted) (quoting *Kofron v. Amoco Chems. Corp.*, 441 A.2d 226, 227 (Del. 1982)).

[51] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 537 (Del. 2011).

[52] *Id.* at 536.

[53] *E.g.*, *Clouser v. Doherty*, 175 A.3d 86, 2017 WL 3947404, at *9 (Del. 2017) (TABLE); *In re USG Corp. S'holder Litig.*, 2021 WL 930620, at *3–4 (Del. Ch. Mar. 11, 2021), *aff'd sub nom.*, *Anderson v. Leer*, 265 A.3d 995 (Del. 2021); *In re Trados Inc. S'holder Litig.*, 2009 WL 2225958, at *8 (Del. Ch. July 24, 2009).

dismiss."[54]  Despite this forgiving standard, the Court need not accept conclusory allegations unsupported by specific facts or draw unreasonable inferences in favor of the nonmoving party.[55]  "Moreover, the court is not required to accept every strained interpretation of the allegations proposed by the plaintiff."[56]  In determining whether to grant a motion to dismiss, the Court may consider any documents incorporated into the complaint by reference.[57]

Buyer brings claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and declaratory judgment.[58]  I address them in turn.

### A.    Breach of Contract

"Under Delaware law, a breach of contract claim comprises three elements: (1) the existence of a contract; (2) a breach of an obligation imposed by that contract; and (3) resultant damages."[59]  "Delaware adheres to the 'objective' theory of contracts, i.e. a contract's construction should be that which would be understood by

---

[54] *Cent. Mortg.*, 27 A.3d at 536.

[55] *E.g.*, *Clinton v. Enter. Rent-A-Car Co.*, 977 A.2d 892, 895 (Del. 2009).

[56] *Trados*, 2009 WL 2225958, at *4 (quoting *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006)).

[57] *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 320 (Del. 2004).

[58] Compl. ¶¶ 54–75.

[59] *Wenske v. Blue Bell Creameries, Inc.*, 2018 WL 3337531, at *9 (Del. Ch. July 6, 2018).

an objective, reasonable third party."[60]  The Court reads the "contract as a whole and we will give each provision and term effect, so as not to render any part of the contract mere surplusage."[61]  "When interpreting a contract, the Court will give priority to the parties' intentions as reflected in the four corners of the agreement."[62]  "If a contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract or to create an ambiguity."[63]

### 1. The Nonsolicit

Count I alleges Seller breached the Agreement by "engaging in (or allowing another within the Seller Group to engage in) prohibited competition as defined by the Agreement ***and, separately, by improperly hiring and employing a former employee of the Company Group***."[64]  In response to my prodding as to whether Buyer had a good faith basis to believe Seller hired Pacheco in breach of the Nonsolicit, Buyer submitted an affidavit admitting Pacheco was not an employee of

---

[60] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) (quoting *NBC Universal v. Paxson Commc'ns*, 2005 WL 1038997, at \*5 (Del. Ch. Apr. 29, 2005)).

[61] *Id.* (quoting *Kuhn Constr., Inc. v. Diamond State Port Corp.*, 990 A.2d 393, 396–97 (Del. 2010)).

[62] *GMG Cap. Invs., LLC v. Athenian Venture P'rs I, L.P.*, 36 A.3d 776, 779 (Del. 2012).

[63] *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997).

[64] Compl. ¶ 58 (emphasis added).

the Company Group "immediately prior to Closing."[65]  Pacheco is thus exempted from the Nonsolicit.[66]  Buyer conceded "the standalone hiring of Mr. Pacheco was not a violation of the nonsolicit encompassed by Section 6.23(a)(i)."[67]

When the Court asks a plaintiff whether it has a good faith basis to bring a claim for breach of a particular provision, and the plaintiff admits there was no breach, the plaintiff should apologize and drop the claim, as the factual contentions do not have the necessary evidentiary support.[68]  That did not happen here.

Instead, Buyer repeated the argument that it cannot know whether a Nonsolicit exception applies without discovery.[69]  But a search of Buyer's own records before filing, instead of afterwards, would have revealed Pacheco was exempted from the Nonsolicit.[70]

---

[65] D.I. 56, Crossken Aff. ¶ 9 [hereinafter "Crossken Aff."]; Agr. § 6.23(a)(i).

[66] Agr. § 6.23(a)(i) ("Seller shall not . . . solicit or hire . . . any employee of the Company Group, in each case as of immediately prior to the Closing . . . .").

[67] Corrected Op. Letter Br. at 9; *see also* D.I. 56 at 6.

[68] Ct. Ch. R. 11(b)(3).

[69] Corrected Op. Letter Br. at 10 ("Only [Seller] can know whether it used generalized searches. . . . [Buyer] cannot know the exact date that an individual was solicited or hired by Seller or any member of Seller Group.  Requiring [Buyer] to plead such facts would make Section 6.23(a)(i) unenforceable."); *see also* PAB at 17; Hearing Tr. 31–33.

[70] Crossken Aff. ¶ 9.

And instead, Buyer tried to gaslight the Court. Buyer asserted it never brought, or attempted to bring, a "separate" breach of the Nonsolicit, because all of its breach of contract claims are lumped into one count.[71] Buyer seems to think an unsubstantiated claim is acceptable if it is packaged up with other claims within one count. Buyer is wrong.

And Buyer actually brought a "separate" claim for breach of the Nonsolicit. Count I states, "[Seller] breached the Agreement by . . . engaging in (or allowing another within the Seller Group to engage in) prohibited competition as defined by the Agreement and, *separately*, by improperly hiring and employing a former employee of the Company Group."[72] The complaint alleges the details of Pacheco's hiring,[73] and the August 14 Letter integral to the complaint states Pacheco's hiring was "violative of Section 6.23(a)(i)" specifically.[74] Buyer, Seller, and the Court all proceeded with the understanding that Buyer had brought a claim for breach of the

---

[71] Corrected Op. Letter Br. at 3 ("The breach of the nonsolicit and noncompete clauses of Section 6.23 is not plead *separately*, but rather, the breach of Section 6.23 is pled as one Count." (emphasis added)); *id.* at 6 ("Neither Count I nor any other count of the Complaint separately pleads a breach of the nonsolicitation clause of Section 6.23."); Reply Letter Br. at 3 (contending Buyer "has not stated, *nor attempted to state*, a separate claim solely based upon a violation of the nonsolicitation provision" (emphasis added)).

[72] Compl. ¶ 58 (emphasis added).

[73] *See id.* ¶¶ 52–53.

[74] Aug. 14 Letter at 2; *see* Hearing Tr. 30 (describing the August 14 Letter as "embraced by the complaint").

Nonsolicit.[75]  On Seller's motion to dismiss, Buyer included a section titled "The [Amended Complaint] Sufficiently Pleads a Breach of the Agreement's Non-Solicitation Provision."[76]  And at oral argument, Buyer's counsel engaged in a lengthy discussion with the Court about its pleading burden for that claim.[77]  Buyer clearly pled a Nonsolicit breach "separately" from a Noncompete breach.[78]  Buyer's attempt to convince the Court otherwise in order to excuse the absence of a good faith basis to bring that claim is foolish and shocking.

And Buyer attempts to frame my concern as "concern[] with [Buyer's] and counsel's good faith basis to include in Count I facts regarding the breach of Section 6.23 by improperly hiring *at least one* employee."[79]  The complaint alleges the improper hiring of exactly one employee:  Pacheco.[80]  I do not consider Buyer's arguments regarding additional hires.[81]

---

[75] *See generally* DOB; PAB; DRB; Hearing Tr.

[76] PAB at 15.

[77] Hearing Tr. 26–36.

[78] Compl. ¶ 58.

[79] Corrected Op. Letter Br. at 5 (emphasis added).

[80] Compl. ¶ 58 ("Recess breached the Agreement by . . . improperly hiring and employing *a* former employee of the Company Group." (emphasis added)); *see also id.* ¶¶ 52–53; Aug. 14 Letter at 2.

[81] Corrected Op. Letter Br. at 8–10.

Finally, Buyer tries to shade Pacheco's hiring as cause for concern with context. That context is smudged by imprecision, perhaps suspiciously so. Buyer's counsel stated at argument that the August 14 Letter demanded information from Seller about the hiring, and Seller did not respond, leaving Buyer to conclude Pacheco's hire must have been a breach.[82] But the August 14 Letter does not demand information.[83] And Buyer argues Pacheco boasted he would hire more Seller employees to support the NJ Transit Region 6 bid.[84] But Buyer's brief misquotes the underlying affidavit, which states a Buyer employee understood Pacheco's employer would hire more Seller employees—not that Pacheco boasted he would.[85]

---

[82] *See* Hearing Tr. 34–35.

[83] *See generally* Aug. 14. Letter.

[84] Corrected Op. Letter Br. at 7 ("[I]n or around August 2024, I understood that Mr. Pacheco had been openly boasting that NJ Transit would award [Seller Sub 2] the Region 6 Contract due in part to his efforts to obtain it for [Seller Sub 2]. Among the things that [Buyer] understood Mr. Pacheco to be telling others were that he would be General Manager overseeing the contract *and that he would hire as many [Target]/[Buyer] employees as possible who currently worked at [Target], and who were supporting the Region 6 Contract.*" (emphasis added)) (citing Crossken Aff. ¶ 8).

> Buyer's letter includes the foregoing parenthetical as a block quotation. But it is a misquote. The following footnote contains the correct quotation.

[85] Crossken Aff. ¶ 8 ("[I]n or around August 2024, I understood that Mr. Pacheco had been openly boasting that NJ Transit would award [Seller Sub 2] the Region 6 Contract due in part to his efforts to obtain it for [Seller Sub 2]. Among the things that [Buyer] understood Mr. Pacheco to be telling others were that he would be General Manager overseeing the contract. *It was also my understanding that with Mr. Pacheco as the General Manager,*

Buyer's claim under Count I for breach of the Nonsolicit is dismissed. In the absence of prejudice to the administration of justice in these proceedings, I will go no further.[86]

---

*[Seller Sub 2] would hire as many [Target]/[Buyer] employees as possible who currently worked at [Target], and who were supporting the Region 6 Contract.*" (emphasis added)).

The August 14 Letter asserts Pacheco boasted about the contract, but not additional hires. Aug. 14 Letter at 2 ("[Buyer] has learned that Mr. Pacheco was specifically included on the improper NJT Region 6 RFP bid and, since being included on the bid submission, has openly boasted that his employer would be awarded the NJT Region 6 contract."). In litigation, Buyer has been imprecise, I fear intentionally so, as to whether Pacheco was boasting specifically about more hires. Buyer's counsel's affidavit is imprecise as to whether Pacheco was boasting that Seller Sub 2 would hire Target employees or Buyer simply "understood" that with Pacheco on board, Seller Sub 2 would hire Target employees. D.I. 56, Hasan Aff. ¶ 2 [hereinafter "Hasan Aff."] (using inscrutable syntax); *id.* ¶ 4 (describing Buyer's belief "that Mr. Pacheco and/or [Seller Sub 2] would act on Mr. Pacheco's boasting to solicit and/or hire additional [Buyer] employees"). Buyer's district manager's affidavit is similarly imprecise. Crossken Aff. ¶ 11 (describing his belief that "if NJ Transit awarded [Seller Sub 2] the contract, that Mr. Pacheco and/or [Seller Sub 2] would act on Mr. Pacheco's boasting to solicit and/or hire additional [Buyer] employees"). Buyer's letter states, "Mr. Pacheco was not identified in the pleading because [Buyer] knew of his improper hiring (boasting that his hiring diverted NJ Transit to [Seller Sub 2] and hired away [Buyer] employees) but not the specifics of his conduct." Corrected Op. Letter Br. at 9. That sentence is hard to parse, and it functions to obfuscate the subject of Pacheco's boasting. Buyer's brief also quotes counsel's imprecise language. *Id.* at 12.

[86] *Crumplar v. Superior Court ex rel. New Castle Cty.*, 56 A.3d 1000, 1009 (Del. 2012).

### 2.    The Noncompete

Buyer alleges Seller Sub 3's bids on the 2023 EXO RFP and the 2024 EXO RFP as well as Seller Sub 2's bid on the Region 6 RFP breached the Noncompete.[87] But each bid falls under the Noncompete's FS Business Exception.[88]

The Agreement defines "FS Business" as

> the business of Seller, [Seller Sub 1,] and/or their respective controlled Affiliates and parent entities (which includes, for the avoidance of doubt, Total Transportation Corp., Pride Transportation Services, Inc., Bella Bus Corp., GVC II Inc., MJT Bus Company Inc. and Atlantic Garden Holdings, Corp. and each of their respective Subsidiaries) and their respective successors and assigns (other than the Company and its Subsidiaries) as of the date of this Agreement and/or the Closing Date.[89]

#### a.    Seller Sub 2's Bid

The parties dispute whether Buyer's allegations regarding Seller Sub 2's bid on the Region 6 RFP state a claim for breach of the Noncompete. Specifically, they dispute whether Seller Sub 2's unsuccessful efforts to obtain the Region 6 contract before Closing make its subsequent efforts FS Business.

First, Buyer suggests the phrase "the business of" a company refers only to the company's existing service contracts, not unsuccessful efforts to obtain

---

[87] Compl. ¶ 58; *see also id.* ¶ 75; PAB at 4.

[88] *See* Agr. § 6.23(a)(ii).

[89] *Id.* § 1.1.

contracts;[90] Seller advances a broader interpretation focused on the "business or endeavor as a whole, not individual instances of conduct."[91] Buyer further argues Seller Sub 2 "could not have been engaged in the NJ Transit Region 6 work at the time of Closing because [Target] held the contract" at that point.[92] Black's Law Dictionary defines "business" as "[a] commercial enterprise carried on for profit."[93] And previous cases have held "the word 'business' means the commercial enterprise of a company."[94] Consistent with these definitions, I conclude "the business of" a company means the company's overall commercial enterprise. This encompasses more than the company's existing service contracts: it also includes efforts to secure new contracts for services the company currently provides, both with existing clients and prospective clients for whom the company has already undertaken business development efforts.

Because Seller Sub 2 is a Subsidiary of Total Transportation Corp., FS Business includes "the business of" Seller Sub 2—i.e., its overall commercial

---

[90] PAB at 12–13.

[91] DRB at 16.

[92] PAB at 12.

[93] *Business*, Black's Law Dictionary (12th ed. 2024).

[94] *Miramar Police Officers' Ret. Plan v. Murdoch*, 2015 WL 1593745, at *12 (Del. Ch. Apr. 7, 2015); *Roccia v. Mugica*, 2020 WL 7765340, at *7 (Del. Ch. Dec. 29, 2020).

enterprise, including both contracts and efforts to obtain them—"as of the date of th[e] Agreement and/or the Closing Date."[95]  Seller Sub 2's bid on the Region 6 RFP is permissible under the FS Business Exception because pursuing that contract was part of Seller Sub 2's business as of Closing.  Buyer's complaint acknowledges Seller Sub 2 had vied for the Region 6 contract before Closing.[96]  Seller Sub 2's pre-Closing business included offering the exact services its Region 6 RFP bid offered.  Pursuing the Region 6 contract is squarely within Seller Sub 2's commercial enterprise, so it falls within the FS Business Exception to the Noncompete.

Next, Buyer contends Seller Sub 2's post-Closing Region 6 bid directly competed for a contract Target has held for twenty-five years, so it must be a breach.[97]  But the purpose of the FS Business Exception is to carve out permissible competition.  Nothing in the Agreement's text suggests the FS Business Exception excludes competition for contracts Target holds.  Consistent with Delaware's

---

[95] Agr. § 1.1 (defining "FS Business" and "Subsidiary").

[96] Compl. ¶ 51.

[97] PAB at 11.

contractarian principles, this Court will not enforce a stronger noncompete than the one Buyer negotiated.[98]

### b.  Seller Sub 3's Bids

The parties also dispute whether Buyer's allegations about Seller Sub 3's EXO RFP bids state a claim for breach of the Noncompete.  Here, Seller Sub 4 becomes relevant.  Seller Sub 3's acquisition of Seller Sub 4 introduced non-student transportation services into Seller's portfolio.[99]  EXO has been Seller Sub 4's client since before Closing.[100]  Seller Sub 4 became Seller's indirect wholly owned subsidiary (and thus Seller's controlled Affiliate[101]) when Seller Sub 3 acquired it between the Agreement and Closing.[102]

Seller Sub 3's acquisition of Seller Sub 4 between the date of the Agreement and Closing puts the last clause of FS Business, defining it "as of the date of this

---

[98] *See GRT, Inc. v. Marathon GTF Tech., Ltd.*, 2012 WL 2356489, at *7 (Del. Ch. June 21, 2012); *MidCap Funding X Tr. v. Graebel Cos.*, 2020 WL 2095899, at *10 (Del. Ch. Apr. 30, 2020).

[99] *See* Compl. ¶¶ 21, 24

[100] *Id.* ¶ 23.

[101] Agr. § 1.1 (defining "Affiliate" to include indirect subsidiaries, and specifying the word "control" in the context of a "controlled Affiliate" "means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise").

[102] Compl. ¶¶ 21, 24.

Agreement and/or the Closing Date," to the test. The parties dispute whether a controlled Affiliate brought into the tent after the date of the Agreement but before Closing can contribute to FS Business. It can. "The common interpretation of the term 'and/or' is that it means either or both."[103] Here, the conjunction's use signifies two benchmark dates, so that "FS Business" comprises all qualifying business across both dates. Because Seller Sub 4 was acquired pre-Closing, its business as of Closing qualifies as "the business of . . . [Seller's] controlled Affiliates . . . as of the date of th[e] Agreement and/or the Closing Date."[104] Thus, Seller Sub 4's business as of Closing qualifies as FS Business. And Seller Sub 4's business as of Closing included bidding on EXO RFPs and servicing EXO.

That brings new contracts with EXO within the ambit of FS Business. So Seller Sub 3's bids on the EXO RFPs fall under the FS Business Exception. Under that exception, the Noncompete only prohibits competitive activity that is not FS Business.[105] The Agreement defines FS Business by reference to various Seller

---

[103] *State v. Getty Oil Co. (E. Operations) Inc.*, 305 A.2d 327, 332 (Del. Super. 1973); *And/or*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/and%2For (noting "and/or" is "used as a function word to indicate that two words or expressions are to be taken together or individually").

[104] Agr. § 1.1.

[105] *Id.* § 6.23(a)(ii).

Group companies, but the carve-out itself does not vary by entity.[106]  Any Seller Group company can engage in any FS Business.  Seller Sub 3's bids on the EXO RFPs did not violate the Noncompete.

Buyer contends that not applying the FS Business Exception on an entity-by-entity basis renders it meaningless.[107]  Not so.  The Noncompete may allow Seller more flexibility across its corporate structure than Buyer wishes, but it has meaning. It restricts Seller and its affiliates from engaging in competitive activity that falls outside the FS Business Exception.  "Parties have a right to enter into good and bad contracts, the law enforces both."[108]

It is also irrelevant that Seller Sub 3 did not provide non-student transportation services when it signed the Agreement, then purchased Seller Sub 4 before Closing.[109]  Neither the Noncompete nor the Agreement more broadly makes any distinction based on whether Seller or any of its subsidiaries provided non-student transportation services, at all or before signing.[110]  Buyer argues this plain meaning

---

[106] *Id.* § 1.1.

[107] PAB at 9–10.

[108] *Nemec v. Shrader*, 991 A.2d 1120, 1126 (Del. 2010).

[109] PAB at 8–9.

[110] *See generally* Agr.

interpretation would frustrate the Agreement's "fundamental purpose."[111]  Buyer alleges it "understood the definition of 'FS Business' did not include entities that primarily provided non-student transit services."[112]  But the FS Business definition simply makes no distinction based on the type of service an entity provides.[113] Buyer's understanding does not comport with the Agreement's unambiguous terms as they "would be understood by an objective, reasonable third party."[114]

In sum, each of Seller's affiliates' competing bids constituted permissible competition under the Noncompete's FS Business Exception.  Buyer's pleadings do not state a claim for breach of the Noncompete.  Buyer's Count I claim for breach of the Noncompete is dismissed.

### B.    Buyer Does Not State An Implied Covenant Breach.

With no contractual basis for its claims, Buyer turns to the implied covenant of good faith and fair dealing.  Buyer fails to state a claim because Buyer has not identified a gap in the Agreement for the implied covenant to fill.

---

[111] PAB at 10–11.

[112] Compl. ¶ 15.

[113] Agr. § 1.1.

[114] *Osborn*, 991 A.2d at 1159.

"The implied covenant of good faith and fair dealing inheres in every contract and requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain."[115]   But it "is a limited and extraordinary legal remedy."[116]   "[A]n essential predicate for the application of the implied covenant is the existence of a 'gap' in the relevant agreement."[117]   The implied covenant "cannot be used to circumvent the parties' bargain, or to create a free-floating duty unattached to the underlying legal document."[118]   Thus, a contracting party "generally cannot base a claim for breach of the implied covenant on conduct authorized by the terms of the agreement."[119]

Buyer alleges Seller breached the implied covenant by

(1) arbitrarily selecting which entities to include by name in the definition of "FS Business," (2) unreasonably claiming the definition of "FS Business" includes more than the specific entities listed, (3) unreasonably failing to disclose the existence, potential acquisition, and pre-Closing acquisition of [Seller Sub 4] directly to [Buyer], which was not known by [Buyer's] agents until after the [Seller Sub 4] acquisition

---

[115] *Kuroda v. SPJS Hldgs., L.L.C.*, 971 A.2d 872, 888 (Del. Ch. 2009) (quoting *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del. 2005)) (cleaned up).

[116] *Nemec*, 991 A.2d at 1128.

[117] *CPC Mikawaya Hldgs., LLC v. MyMo Intermediate, Inc.*, 2022 WL 2348080 (Del. Ch. June 29, 2022)

[118] *Dunlap*, 878 A.2d at 441 (cleaned up).

[119] *Id.*

was completed; (4) failing to transfer [Seller Sub 4] to [Buyer] upon Closing; (5) transferring the acquisition of [Seller Sub 4] from [Target] to a [Seller Sub 1] subsidiary to avoid its obligations under the Agreement; and/or (6) seeking out and acquiring [Seller Sub 4] between the execution of the Agreement and the Closing of the Transaction to circumvent [Buyer's] protections under Section 6.23.[120]

Buyer also alleges Pacheco's hiring breached the implied covenant.[121]

None of Buyer's allegations reflect a contractual gap. Regarding the first two allegations listed above, the FS Business definition unambiguously applies to the listed entities as well as any additional entities that meet the definition's requirements.[122] To the extent the list is arbitrary, that does not indicate a gap in the Agreement.

Regarding Seller's alleged failure to disclose the Seller Sub 4 acquisition, the FS Business definition expressly contemplates potential expansion of FS Business up until Closing.[123] Buyer easily could have negotiated for the disclosure of

---

[120] Compl. ¶ 66; *see also id.* ¶ 65 ("On information and belief, [Seller] sought out and acquired [Seller Sub 4], a competitor of [Buyer], between the execution of the Agreement and the Closing . . . to use that acquisition to try to nullify Section 6.23 . . . .").

[121] *Id.* ¶ 67.

[122] Agr. § 1.1.

[123] Agr. § 1.1 ("FS Business" means "the business of Seller, [Seller Sub 1,] and/or their respective controlled Affiliates and parent entities . . . as of the date of this Agreement and/or the Closing Date.").

acquisitions that expand FS Business.[124]  The alleged lack of disclosure does not suggest a contractual gap.[125]

As to the fourth allegation, Buyer contends "the purpose of the Transaction . . . was for [Buyer] to purchase [Seller's] non-student transit services business," and therefore, Seller Sub 4 should have been transferred to Buyer upon Closing.[126]  But Buyer points to no provision of the Agreement indicating this purpose, nor any provision suggesting Buyer was entitled to acquire any non-student transit services business Seller acquired before Closing.[127]  The implied covenant may not be wielded to supply terms the parties could have secured at the bargaining table.[128]

Regarding the fifth allegation, Buyer contends that "[t]o avoid the obligation to transfer [Seller Sub 4] to [Buyer] upon Closing, [Buyer] suspects the acquisition of [Seller Sub 4] was transferred from [Target] to [Seller Sub 3] (a [Seller Sub 1] subsidiary).  Under this reasonably conceivable set of circumstances, [Buyer] is

---

[124] *Allied Cap. Corp. v. GC-Sun Hldgs., L.P.*, 910 A.2d 1020, 1035 (Del. Ch. 2006).

[125] And Buyer's supplemental briefing acknowledges it was aware of the Seller Sub 4 acquisition before Closing.  Reply Letter Br. at 7–8.  The Hasan affidavit acknowledges Seller notified Buyer that because of the acquisition, Seller Sub 4's business would be part of FS Business.  Hasan Aff. ¶ 12.

[126] PAB at 24 (first citing Compl. Exs. 11–12; and then citing Compl. ¶¶ 10, 65).

[127] *See generally* Compl.; PAB at 24; *see Dunlap*, 878 A.2d at 441.

[128] *Allied Cap. Corp.*, 910 A.2d at 1035.

entitled to recover under a claim for breach of the implied covenant."[129]   As explained, the Agreement provides no indication that Seller was obligated to transfer Seller Sub 4 to Buyer.  Seller's alleged action to avoid a nonexistent obligation does not breach the implied covenant.

Buyer's sixth allegation fares no better.  Seller's acquisition of Seller Sub 4 before Closing may have weakened the Nonsolicit.  But that does not suggest a gap in the contract.  As explained, the FS Business definition expressly contemplates potential expansion of FS Business up until Closing.[130]   In other words, Seller's conduct was "authorized by the terms of the agreement."[131]

Finally, Pacheco's hiring did not breach the implied covenant.  As explained, Seller was permitted to hire Pacheco under the Nonsolicit's express terms.[132] Because Buyer identifies no contractual gap for the implied covenant to fill, Count II is dismissed.

---

[129] PAB at 24.

[130] Agr. § 1.1.

[131] *Dunlap*, 878 A.2d at 441.

[132] *Id.*; *see supra* Section II.A.1.

### C. Buyer Does Not State A Declaratory Judgment Claim.

Buyer's claim for declaratory judgment is premised on claims that are now dismissed.[133] Buyer therefore does not state a claim for declaratory judgment. Count III is dismissed.

## III. CONCLUSION

Seller's motion to dismiss is granted.

Sincerely,

*/s/ Morgan T. Zurn*

Vice Chancellor

MTZ/ms

cc: All Counsel of Record, via *File & ServeXpress*

---

[133] Compl. ¶¶ 71–75.